UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LARISA LEV-ARY,<br><br>       Plaintiff,<br><br> -against-<br><br>MANHATTAN FERTILITY SERVICES LLC; LEGACY IVF LLC; and ADVANCED FERTILITY SERVICES, P.C.,<br><br>       Defendants. | No. 23-5504<br><br>**COMPLAINT AND JURY DEMAND** |

   Plaintiff Larisa Lev-Ary, by and through her attorneys Kaufman Lieb Lebowitz & Frick, alleges as follows:

**PRELIMINARY STATEMENT**

   1. For as long as she can remember, Larisa Lev-Ary has dreamed of being a mother and raising a family with multiple children.

   2. When she reached her 30s without yet having children, she decided to preserve that dream by freezing her eggs.

   3. In 2014, when she was 35 years old, Ms. Lev-Ary met with doctors at Advanced Fertility Services, P.C. ("Advanced Fertility") and started the expensive and painful process of stimulating growth in her ovaries and having the eggs (known as oocytes) extracted and stored.

   4. She was happy to learn that the process was successful: eighteen oocytes were been retrieved, and seventeen were placed in frozen storage.

   5. She felt peace of mind, knowing that she had preserved her ability to have multiple biological children.

6. When she learned, two years later, that Advanced Fertility was transferring its business over to Manhattan Fertility Services ("MFS"), which was apparently owned by Legacy IVF and which used the name "Legacy IVF" interchangeably with MFS, Ms. Lev-Ary grew concerned about leaving her oocytes in the hands of this unknown company. She and a friend visited the facility to check that everything was in order.

7. But when MFS/Legacy IVF employees brought her back to see the storage room, Ms. Lev-Ary was shocked to see a straw containing (according to MFS) her oocytes resting on top of the cryogenic tank. She had no idea how long her oocytes had been outside of the freezer tank, and she had no way of knowing whether her oocytes were safe.

8. In fact, the oocytes were not safe.

9. After having one child without using any frozen oocytes in 2018, Ms. Lev-Ary struggled with fertility. In July 2021, she brought her frozen oocytes to a renowned fertility specialist to fertilize them and hopefully implant an embryo.

10. Instead, Ms. Lev-Ary's doctor informed her that her worst nightmare had come true: every single one of her oocytes was destroyed and unusable—a scenario her doctor said was unheard of unless the eggs had been improperly stored.

11. Ms. Lev-Ary's dreams were crushed. At age 44, she has been told it will be almost impossible for her to have any more biological children.

12. Defendants had one job: to keep Ms. Lev-Ary's oocytes—and her hopes—alive. They failed. They must compensate her for her incalculable loss.

## PARTIES

13. Plaintiff Larissa Lev-Ary is a 44-year-old woman who resides in and is a citizen of New Jersey.

14. Defendant Manhattan Fertility Services LLC ("MFS") is a registered business in New York with offices at 1625 Third Avenue, New York, New York. It is a duly licensed long-term tissue bank and storage facility in the State of New York. The sole member of MFS is G.J. USA Inc., a Delaware corporation.

15. Defendant Legacy IVF LLC is a business registered in New York and doing business at 1625 Third Avenue, New York, New York. The sole member of Legacy IVF is G.J. USA Inc., a Delaware corporation. Legacy IVF LLC owns MFS. When interacting with Plaitniff, MFS and Legacy IVF used each other's names interchangeably.

16. Defendant Advanced Fertility Services, P.C. is a registered business in New York with offices at 1625 Third Avenue, New York, New York.

## JURISDICTION AND VENUE

17. The jurisdiction of this Court is predicated upon 28 U.S.C. § 1332, as Plaintiff and Defendants are citizens of different States and the amount in controversy exceeds $75,000.

18. The acts complained of occurred in the Southern District of New York, and venue in this Court is proper under 28 U.S.C. § 1391(b).

## JURY DEMAND

19. Plaintiff demands a trial by jury in this action.

## FACTUAL ALLEGATIONS

### *Ms. Lev-Ary Freezes Her Eggs In the Hope of Becoming a Mother*

20. Ms. Lev-Ary always wanted to be a mother.

21. In 2014, Ms. Lev-Ary—who was then 35 years old—decided to freeze her eggs to ensure that she would be able to have children in the future, when she was ready.

22. Ms. Lev-Ary researched fertility specialists and decided to use Advanced Fertility Services, which promised her that it would use the utmost care in collecting and storing her oocytes.

23. In Fall 2014, Ms. Lev-Ary visited Advanced Fertility Services and began the lengthy and painful process of stimulating oocyte development and extraction.

24. In November, AFS was able to retrieve eighteen oocytes, seventeen of which were able to be stored.

25. Ms. Lev-Ary was thrilled to have seventeen oocytes, which gave her a good chance of successfully creating three or four viable embryos for implantation.

26. In October 2016. Ms. Lev-Ary received a letter from Advanced Fertility Services informing her that it was "handing off the day-to-day operation and management of its IVS laboratory facility to Manhattan Fertility Services, LLC."

27. The notice instructed Ms. Lev-Ary to decide, within 60 days, whether Advanced Fertility Services should transport her oocytes to a different facility, destroy them, or keep them where they were and transfer "the long-term and management [sic] of [her] . . . oocyte(s) to Manhattan Fertility Services."

28. Ms. Lev-Ary was concerned. She did not know anything about MFS and worried about entrusting an unknown company with the care of her oocytes. Her calls to the facility went unanswered.

29. Wanting to learn more, she decided to visit MFS, which was located at the same Third Avenue location as Advanced Fertility had been.

4

### *MFS Exposes Ms. Lev-Ary's Eggs*

30. Ms. Lev-Ary arrived at MFS in or around November 29, 2016, accompanied by a friend.

31. She told the employee at the front desk that her oocytes were stored there and that she wanted to check on them to make sure they were safe.

32. It was during this visit that she learned, for the first time, that in fact only sixteen oocytes had been stored and frozen, not seventeen. She was given no explanation as to what happened to her seventeenth oocyte; it was apparently lost or destroyed.

33. Ms. Lev-Ary was upset by this revelation and sought confirmation that the remaining sixteen were securely stored.

34. Finally, after much back and forth, the woman at the front desk told Ms. Lev-Ary to wait while she went down to the lab. A few minutes later, she returned and told Ms. Lev-Ary to follow her.

35. The employee led Ms. Lev-Ary downstairs, where the door to the lab was open. Ms. Lev-Ary was not permitted to go past the doorway. A few feet away sat a large man who described himself as the lab "owner" next to a cryogenic tank.

36. On the top of the tank rested metal straws used to hold oocytes. The straws were outside the tank when Ms. Lev-Ary arrived; she did not see any staff member remove them from the tank.

37. Ms. Lev-Ary was not permitted to get close enough to read the labels to confirm that they were her oocytes, but the staff member assured her that those were her oocytes.

38.     Ms. Lev-Ary was reassured that her oocytes were there, but concerned and upset that the straw was outside of the tank. She told her friend that she thought the oocytes should not have been outside of the tank.

39.     As time went on, Ms. Lev-Ary grew increasingly distressed as she thought about the visit. Why were the straws of oocytes outside of the freezer when she arrived? How long had they been out? How long did they stay out of the freezer before being returned? Had the exposure to room temperature damaged the oocytes? Ms. Lev-Ary had no way to answer any of these questions.

40.     Her concern grew to panic during discussions with her fertility doctor in the fall of 2017, as she underwent intrauterine insemination (IUI) procedures, the second of which resulted in a successful pregnancy. Ms. Lev-Ary described her visit to MFS to her fertility doctor, who expressed shock that the straws with her oocytes were sitting out for her to see.

***MFS Confirms the Straws Should Never Have Been Left Out***

41.     Distressed after this conversation with her doctor, Ms. Lev-Ary called MFS in September 2017 to discuss the incident.

42.     She spoke with a woman who described herself as the "owner," and whose name sounded like "Cynthia."

43.     Cynthia confirmed that "the only reason you would pull [the straws] out is if you were going to thaw them, for use." She went on: "I can pull them out for maybe 10 seconds," but 10 minutes "is too long."

44.     Cynthia was incredulous that the straws would be outside of a container. When Ms. Lev-Ary confirmed that that's how she saw them, the woman replied, "No one would take it out and just put it on the counter." When Ms. Lev-Ary asked if there was

6

any way to check on her oocytes to confirm they were not damaged, Cynthia said there was no way to do that until they were thawed—but insisted: "They were not compromised—I can guarantee that."

45. Despite promising to follow up with Ms. Lev-Ary, Cynthia never called her back or sent her any further information.

### *Ms. Lev-Ary Discovers More Shockingly Negligent Treatment of Her Eggs*

46. After successfully giving birth to her first and only child using IUI (*i.e.*, not requiring the use of her frozen oocytes) in June 2018, Ms. Lev-Ary was eager for her child to have a sibling. Two IUI attempts in Fall 2020 were unsuccessful, as were two in vitro fertilization (IVF) attempts in winter 2020-2021, which did not use her frozen oocytes.

47. Hoping for better luck with her younger eggs, Ms. Lev-Ary decided to bring her frozen oocytes to a RMANJ, a leading fertility center in New Jersey, to attempt another IVF procedure.

48. In July 2021, she rented a cryogenic tank from Repro Lab, Inc., which MFS packed with her oocytes for her to transport to RMANJ, whose technicians then unpacked the tank. (It is common for patients to arrange for their own transport of oocytes between facilities, and companies like Repro Lab, Inc. provide rental tanks for that purpose.)

49. She signed a form on letterhead that used both MFS's and Legacy IVF's names allowing the facility to release her oocytes.

50. Ms. Lev-Ary never opened the tank or handled the materials once they were packed by MFS.

51. As she drove to New Jersey that day in July, she felt exhilarated to start the process of growing her family.

52. When the oocytes were unpacked, she was shocked to learn that two of the sixteen oocytes she transported had no label. In other words, there was no way to tell whether those two oocytes belonged to her—and, if they did not, what had happened to her two oocytes.

53. RMANJ was baffled by the lack of labeling and told her how unusual it was to see such sloppiness. The doctors there proposed segregating those two oocytes and fertilizing all of them; if the two unlabeled oocytes became embryos, they would run genetic testing to confirm that they belonged to Ms. Lev-Ary.

54. As Ms. Lev-Ary discussed the matter with RMANJ, she called MFS/Legacy IVF to ask how this labeling error could have happened. Upon information and belief, she spoke with the Lab Director, Dr. Wu.

55. Dr. Wu confirmed that the lab must have made a mistake when it told Ms. Lev-Ary that she had seventeen oocytes in storage, not sixteen. And he acknowledged that the labeling error "is definitely unacceptable."

56. He could provide no information as to why two oocytes were without labels, or even guarantee they belonged to Ms. Lev-Ary. And if they did not belong to her, he had no way to reassure her that two of *her* oocytes weren't floating around unlabeled elsewhere at MFS/Legacy IVF—or worse, that they had not been fertilized and used by another unsuspecting mother.

57. Ms. Lev-Ary also asked why there was a notation in her MFS records that MFS/Legacy IVF had moved her oocytes to a different tank in October 2017, but Dr. Wu had no explanation.

58. He speculated that perhaps MFS/Legacy IVF had needed more space in the tank and moved her oocytes from an "old" tank to a newer one. He could provide no further information.

### *All Sixteen Eggs Were Destroyed*

59. On July 26, 2021, RMANJ thawed Ms. Lev-Ary's sixteen oocytes to prepare for insemination. As per standard RMANJ protocol, two embryologists oversaw the thaw.

60. Each egg was carefully examined—and each one was found to be degenerated and non-viable.

61. The embryologists and physicians at RMANJ were shocked. They had never seen an entire cohort of sixteen oocytes revealed to be dead upon thawing.

62. Dr. Eli Rybak described the "devastating" findings in his notes. He told Ms. Lev-Ary that this had never happened before in his experience, or in all of RMANJ's history.

63. There had been no freezer or lab errors or issues at RMANJ, and Dr. Rybak told Ms. Lev-Ary he had never seen this issue arise just from transferring oocytes from one lab to another.

64. Dr. Rybak explained "that failed survival of oocytes at thaw is much likelier due to an antecedent insult, rather than at moment of thaw."

65. Ms. Lev-Ary told him about the 2016 incident in which she saw the straws of her oocytes sitting outside the frozen tank, and Dr. Rybak confirmed that the degeneration could have happened at that time.

66. Dr. Kathleen Hong, the associate laboratory director at RMANJ, confirms how "extremely unusual" this situation was:

> I have never heard of a cohort of this many frozen eggs revealing themselves to be degenerated during the warming process. ***In the thousands of eggs RMANJ has thawed at its facilities, I have never heard of a similar occurrence***, in which all transported eggs for a patient were degenerated.

**Ex. A** (Affidavit of Kathleen Hong) (emphasis added). She also confirms that RMANJ experienced no laboratory issues at that time nor had similar incidents with other patients' oocytes or embryos that had shared the equipment.

67. Ms. Lev-Ary was devastated. Those sixteen oocytes represented her entire chance at future biological children.

68. Multiple subsequent efforts to retrieve more oocytes and create embryos have thus far proved fruitless.

69. Because those sixteen oocytes were destroyed, Ms. Lev-Ary may never have another chance at having a biological child.

70. Ms. Lev-Ary experienced severe anguish at the loss of the future children she had always imagined. For months, she cried nearly every day, and fell into a deep depression. She developed anxiety and lost her energy, which led her work to suffer. To this day, she struggles to sleep more than four hours a night, as she lays awake imagining the children she will never meet. She is also left wondering every day whether her own biological children—made with two oocytes that belong to her but were misplaced—are living somewhere else, totally unknown to her. It is a thought that haunts her.

71. Ms. Lev-Ary later learned that the straws used by MFS to store her oocytes had been recalled by the manufacturer in 2012, but were still in use in 2014, when she placed her oocytes in the care of Advanced Fertility Services and then MFS.

72. Upon information and belief, the New York State Department of Health is investigating MFS for its mishandling of Ms. Lev-Ary's oocytes.

73. Ms. Lev-Ary spent approximately $11,200 to retrieve her oocytes and store them from November 2014 to July 2021. Since July 2021, she has spent another $69,000 out of pocket to attempt additional egg harvesting and transfers, not including the costs of medications and other fertility treatments. None of these costs were covered by insurance.

## FIRST CAUSE OF ACTION
### Negligence and/or Gross Negligence

74. Plaintiff repeats and realleges the prior allegations as if fully set forth herein.

75. Defendants owed Plaintiff a duty to exercise reasonable care in all aspects of storing and preserving Plaintiff's oocytes so as to avoid damaging them, destroying them, or jeopardizing their viability.

76. The special and sensitive nature of the service Defendants provided—preserving Plaintiff's ability to bear children and create the family she dreamed of—required Defendants to use all reasonable care to preserve Plaintiff's oocytes and her emotional well-being.

77. Defendants failed to exercise reasonable care in storing Plaintiff's oocytes. The negligent acts include but are not limited to moving the oocytes from tank to tank without explanation; storing two oocytes without labels with no way to verify their identity; removing the straw of oocytes from the cryogenic freezer and laying it on top of the tank for an inappropriate and unknown period of time; and using a straw device that

11

had been recalled years earlier. These acts and/or omissions are ones that that a reasonably prudent person in a similar situation would not have made.

78. Defendants' acts and omissions, as detailed herein, evinced a failure to use even slight care and/or constituted conduct so careless as to show complete disregard for Plaintiff's rights.

79. It was reasonably foreseeable to Defendants that Plaintiff would experience severe emotional distress as a result of any breach of their duty of reasonable care.

80. The total destruction of Plaintiffs' oocytes is the sort of injury that would not ordinarily happen without negligence; Plaintiffs' oocytes were in the exclusive control of Defendants; and Plaintiff did not contribute in any way to the destruction of her oocytes. Defendants' negligence can be inferred from the injury itself, under the theory of *res ipsa loquitur*.

81. As a direct and proximate cause of Defendants' negligence, Plaintiff suffered harm in an amount to be determined at trial, including economic damages and serious emotional distress.

## SECOND CAUSE OF ACTION
### Medical Malpractice

82. Plaintiff repeats and realleges the prior allegations as if fully set forth herein.

83. Upon information and belief, Defendants were not medical providers and/or did not provide Plaintiff any medical services. However, in the alternative, Plaintiff pleads that, to the extent they were medical providers and/or provided Plaintiff

12

medical services, they breached the standard of care in New York, and that breach proximately caused Plaintiff's injury.

84. Defendants deviated from accepted medical practice by, among other things, removing Plaintiff's frozen oocytes from the cryogenic tank for an unknown period of time, using recalled equipment, failing to carefully and adequately label specimens in its care, and moving Plaintiff's frozen oocytes between tanks. Upon information and belief, Defendants lacked adequate systems in place, such as alarms on tanks and thorough training of staff, required by the standard of care to ensure the proper care of Plaintiff's oocytes.

85. A reasonably prudent medical provider in Defendants' position would not have made Defendants' acts and omissions, as detailed herein.

86. As a direct and proximate cause of Defendants' negligence, Plaintiff suffered harm in an amount to be determined at trial, including economic damages and serious emotional distress.

## THIRD CAUSE OF ACTION
### Bailment

87. Plaintiff repeats and realleges the prior allegations as if fully set forth herein.

88. Plaintiff gave and Defendants accepted her frozen oocytes to Defendants to store and keep safe, creating a bailment.

89. The oocytes were in Defendants' actual possession from November 2014 to July 2021. Throughout that time, the oocytes belonged to Plaintiff and could only be released to Plaintiff.

90. While the oocytes were in their possession, Defendants had a duty to keep the oocytes safe and protect them from damage or loss.

91. Defendants breached this duty. Defendants returned the oocytes to Plaintiff irrevocably damaged, destroyed, and unusable. Moreover, Defendants lost one of her seventeen oocytes and could not be certain that two of them actually belonged to her.

92. As bailees, Defendants are liable to Plaintiff for the loss of her oocytes.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

1. Awarding compensatory damages, including economic and emotional distress damages;

2. Directing other and further relief as the Court may deem just and proper.

Dated:   June 28, 2023
         New York, New York

                                             KAUFMAN LIEB LEBOWITZ &
                                             FRICK LLP

                                             _____/s/_____
                                             Alison Frick
                                             Alanna Kaufman
                                             18 E. 48th Street, Suite 802
                                             New York, New York 10017
                                             (212) 660-2332

## CERTIFICATE OF MERIT

Pursuant to CPLR3012-a, I, Alison Frick, certify that I have revied the facts of this case and have consulted with at least one physician who I believe is knowledgeable in the relevant issues involved in this action and I have concluded on the basis of such review and consultation that there is a reasonable basis for the commencement of this action.

_____
Alison Frick, Esq.


<u>June 28, 2023</u>
Date