UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LARISA LEV-ARY,<br><br>                    Plaintiff,<br><br>          v.<br><br>MANHATTAN FERTILITY SERVICES LLC<br>et al.,<br><br>                    Defendants. | 23 Civ. 5504 (DEH)<br><br>**OPINION<br>AND ORDER** |

DALE E. HO, United States District Judge:

In 2014, Plaintiff Larisa Lev-Ary underwent a medical procedure to stimulate growth in her ovaries and have the immature eggs—known as oocytes—extracted and stored.  A fertility clinic retrieved eighteen of Ms. Lev-Ary's oocytes, and most were placed in frozen storage.  Seven years later, when Ms. Lev-Ary had her frozen oocytes thawed so they could be fertilized, she discovered that they were all destroyed and unusable.  Ms. Lev-Ary subsequently filed this suit against the businesses responsible for storing and caring for her oocytes: Manhattan Fertility Services LLC, Legacy IVF LLC, and Advanced Fertility Services, P.C. (collectively, "Defendants").  Ms. Lev-Ary accuses Defendants of negligence, medical malpractice, breach of bailment, and having deceptive business practices.

Currently before the Court are two Motions for Summary Judgment, one filed jointly by Defendants Manhattan Fertility Services LLC and Legacy IVF LLC ("MFS"), ECF No. 85, and the other filed by Defendant Advanced Fertility Services, P.C. ("AFS"), ECF No. 80.  For the reasons explained below, the Motions are **GRANTED IN PART and DENIED IN PART**.

## BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 statements and evidentiary submissions in connection with Defendants' Motions.[1]  The facts are either undisputed or, if disputed, resolved in the light most favorable to Ms. Lev-Ary as the non-moving party, with all reasonable inferences drawn in her favor.  *See Horn v. Med. Marijuana, Inc.*, 80 F.4th 130, 135 (2d Cir. 2023).[2]

On November 7, 2014, Ms. Lev-Ary had her oocyte surgically retrieved at AFS by Dr. Vasilios Goudas, an AFS employee.  Pl.'s Resp. to Def. Advanced Fertility's 56.1 Statement ("AFS 56.1 Stmt.") ¶ 13, ECF No. 94;[3] Pl.'s Statement of Additional Material Facts Not in Dispute ("Pl.'s SAMF") ¶ 19, ECF No. 94.  During the procedure, AFS retrieved eighteen of her oocytes.

---

[1] "The purpose of a 56.1 statement is to 'streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties.'"  *Fujifilm N. Am. Corp. v. PLR IP Holdings, LLC*, No. 17 Civ. 8796, 2024 WL 3520231, at *1 (S.D.N.Y. July 24, 2024) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001)).  Local "Rule 56.1(a) requires the party moving for summary judgment to submit a 'short and concise statement, in numbered paragraphs, of the *material facts* as to which the moving party contends there is no genuine issue to be tried.'"  *Id.* (quoting Local Civ. R. 56.1(a)).  Here, both Defendants have "flagrantly violated" Local Rule 56.1 by, *inter alia*, not submitting "short and concise statement[s]," submitting paragraph-length commentary on non-material facts, and submitting statements not supported by citations to specific parts of the record.  *Id.*  Defendants' non-compliance with this Court's Local Rules is grounds for dismissal of their Motions for Summary Judgment.  However, the Court shall exercise its "broad discretion to . . . overlook [their] failure to comply with local court rules."  *Id.* at *2 (citing *Holtz*, 258 F.3d at 73).  In doing so, the Court cites exclusively to Plaintiff's Response to Defendants' Local Rule 56.1 Statements, ECF No. 94, which clearly and concisely responds to the often compound, immaterial, and unsubstantiated statements put forth by both Defendants.

[2] All references to Rules are to the Federal Rules of Civil Procedure.  In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

[3] ECF No. 94 is an omnibus document containing separate responses to Defendant Advanced Fertility's Local Rule 56.1 Statement, ECF No. 82, and Defendants Manhattan Fertility Services LLC and Legacy IVF LLC's Local Rule 56.1 Statement, ECF No. 87.  ECF No. 94 also contains Plaintiff's Statement of Additional Material Facts Not in Dispute.  For clarity, the Court will cite to these three components of ECF No. 94 separately, giving each of the three its own parenthetical name.

AFS 56.1 Stmt. ¶ 14.  Of the eighteen oocytes, sixteen were frozen for future use.  *Id.*  Dr. Anna Blaszczyk, "AFS's Tissue Bank Director, IVF Director, and sole embryologist," froze Ms. Lev-Ary's sixteen oocytes.  Pl.'s SAMF ¶¶ 22, 24.  The other two oocytes were "jumbo and non-viable," so AFS discarded them.  *Id.* ¶ 21.

AFS stored Ms. Lev-Ary's oocytes in "Cryopettes, which were then placed in . . . canes." AFS 56.1 Stmt. ¶ 15.[4]  The parties dispute whether Cryopettes were approved for the storage of oocytes; Ms. Lev-Ary says that "[a]t the time, the FDA has approved the use of Cryopettes only for freezing and storing embryos, not oocytes," Pl.'s SAMF ¶ 26, while AFS characterizes its experts as testifying "that Cryopettes were marketed as options to store oocytes," AFS 56.1 Stmt. ¶ 34.  Ms. Lev-Ary and AFS dispute how many Cryopettes and how many canes were used to store her oocytes.  AFS contends that Ms. Lev-Ary's "eggs were stored in seven Cryopettes, which were then placed in two canes."  *Id.* ¶ 15.  Ms. Lev-Ary, on the other hand, argues that because "[o]ne of the seven Cryopette straws, containing two oocytes, lacked any identifying label[,] . . . AFS can point to no evidence in the record that those oocytes belonged to [her], or that [her] last two oocytes were in fact stored in the two canes that housed the other six straws containing her oocytes."  *Id.* Ms. Lev-Ary's video evidence substantiates her assertion: it shows that one of the straws was not labeled with her name, as the other six were, and instead only lists the number "3" on it.  *See* Frick Decl. Ex. Y, ECF No. 93-25.

Ms. Lev-Ary and AFS further dispute how well Ms. Lev-Ary's oocytes were cared for after being frozen.  The doctor who testified on AFS's behalf, Dr. Hugh Melnick, "observed logs

---

[4] A "Cryopette" is a type of cryopreservation straw that AFS utilized to hold extracted oocytes at the time of vitrification.  *See* Expert Report of Douglas Joe Raburn at 18 & n.5, ECF No. 80-12; Examination Before Trial of Def. AFS by Dr. Hugh D. Melnick at 46:13-47:13, ECF No. 80-4. Cryopreservation straws are stored in protective sheaths called canes, which are themselves stored in ultra-low temperature freezers or nitrogen tanks.  *See* Expert Report of Douglas Joe Raburn at 18-20, ECF No. 80-12.

confirming that the liquid nitrogen levels were checked in the tanks [storing embryos and oocytes] twice a week throughout 2014." AFS 56.1 Stmt. ¶ 17; *see also* Examination Before Trial of Def. AFS by Dr. Hugh D. Melnick, ECF No. 80-4 at 28:10-24; 89:23-92:5. Ms. Lev-Ary disputes this contention, pointing to a New York State Tissue Bank Evaluation Report stating that the "[l]iquid nitrogen levels [we]re not checked at least twice a week for fluctuations in temperature. Specifically, there are no records of liquid nitrogen levels checks for the embryology laboratory dewars #1, #2, #3, and #4 for the months of February and April through November 2014," ECF No. 93014, and to AFS's Response to the Tissue Bank Evaluation Report, where it "acknowledges that, at the time of the survey, the quality control records from January to the end of November 2014 did not consistently document the monitoring of liquid nitrogen levels in the storage tanks #1, #2, #3, and #4." AFS 56.1 Stmt. ¶ 17.

On October 7, 2015, Ms. Lev-Ary received a bill from AFS for one year of storage of her oocytes. *Id.* ¶ 18. That bill indicated that sixteen of her oocytes were being stored. *Id.* At a time in dispute, either in 2015 or in 2016, AFS began the process of closing its embryology laboratory and transferring ownership and responsibility to MFS. *Id.* ¶ 19. AFS and MFS had, for some undisclosed period of time, an unwritten agreement governing MFS's takeover of AFS's laboratory. *Id.*; Pl.'s SAMF ¶¶ 43-52. MFS officially "took over responsibility for the care of the frozen materials in AFS's custody" in January 2016." Pl.'s SAMF ¶ 54. Ms. Lev-Ary did not learn that AFS had transferred its laboratory to MFS until sometime later in 2016, "no later than November 29, 2016." AFS 56.1 Stmt. ¶ 21; *cf.* Pl.'s SAMF ¶ 55 ("It was not until later in 2016 that notice was sent to AFS clients informing them that MFS was taking over AFS's laboratory services.").

After learning that her oocytes' care had been transferred from AFS to MFS, Ms. Lev-Ary grew concerned and decided to call MFS "to inquire about her oocytes and the change in

ownership." Pl.'s SAMF ¶ 63. After her concerns were not assuaged on the call, Ms. Lev-Ary visited MFS's laboratory. *Id.* ¶ 64; Pl.'s Resp. to Def. MFS's Statement of Material Facts ("MFS 56.1 Stmt.") ¶ 12, ECF No. 94. She "was eventually taken downstairs to see her eggs." MFS 56.1 Stmt. ¶ 13. When she got there, Dr. Timothy Smith, an MFS employee, showed Ms. Lev-Ary her oocytes in the facility's downstairs storage room. *See id.* at ¶ 14; Pl.'s SAMF ¶¶ 74-78. Ms. Lev-Ary noted that the straws containing her oocytes were outside of the storage tanks before she reached the room and stayed outside of the tank for the duration of her visit. Pl.'s SAMF ¶¶ 76, 79, 83-85; MFS 56.1 Stmt. ¶ 16.

After the visit, and after speaking to her doctor, Ms. Lev-Ary grew concerned over how long her oocytes were left out of the cryopreservation tank. Pl.'s SAMF ¶ 79. She called MFS's owner to voice this concern. Pl.'s SAMF ¶ 80-85; MFS 56.1 Stmt. ¶ 20. The owner "assured Ms. Lev-Ary that she would investigate the incident and call Ms. Lev-Ary back," but she never did. Pl.'s SAMF ¶¶ 86-87.

Several years later, in 2021, Ms. Lev-Ary decided to "use the frozen oocytes she had in storage to try to get pregnant." Pl.'s SAMF ¶ 94; *see* MFS's 56.1 Stmt. ¶¶ 22-24. She chose to have a fertility clinic in New Jersey thaw and fertilize her oocytes. Pl.'s SAMF ¶ 95; MFS's 56.1 Stmt. ¶ 24. Ms. Lev-Ary transported her oocytes to this clinic with a portable, rented tank, which MFS packed. Pl.'s SAMF ¶¶ 102-04; MFS 56.1 Stmt. ¶¶ 24-28. When her oocytes were thawed by the New Jersey clinic, the clinic discovered that all sixteen were degenerated and nonviable. Pl.'s SAMF ¶ 136; MFS 56.1 Stmt. ¶ 29.

## LEGAL STANDARDS

Summary judgment is appropriate when a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020). A party opposing summary judgment must establish a genuine issue of fact by citing to particular parts of materials in the record. *See* Fed. R. Civ. P. 56(c)(1)(A). "A party opposing summary judgment normally does not show the existence of a genuine issue of fact to be tried merely by making assertions that are based on speculation or are conclusory." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021).

## DISCUSSION

Ms. Lev-Ary's Amended Complaint contains four causes of action: negligence and/or gross negligence, medical malpractice, breach of bailment, and deceptive business practices. Am. Compl. ¶¶ 79-104. However, in her Opposition to Defendants' Motions for Summary Judgment, she clarifies that she "is not pursuing her medical malpractice claim against both Defendants, her Deceptive Business Practices claim against both Defendants, and her bailment claim against AFS." Pl.'s Mem. L. Opp'n Defs.' Mots. Summ. J. ("Pl.'s Opp'n") at 11 n.4, ECF No. 95. Therefore, below, the Court considers whether summary judgment should be granted as to (I) Ms. Lev-Ary's negligence claim against both Defendants and (II) Ms. Lev-Ary's bailment claim against Defendant MFS.

## I.     Negligence

The parties' papers present several issues with respect to Ms. Lev-Ary's negligence claims, including questions about the proper negligence theory under which Ms. Lev-Ary should bring her claims (which determines the applicable statute of limitations), whether her claims are timely, and whether she can make a prima facie negligence claim with the evidence available to her post-discovery. The Court considers each issue in turn.

### A. Causes of Action

"In New York, an action to recover for personal injuries against a medical practitioner or a medical facility or hospital may be based either on negligence principles or on the more particularized medical malpractice standard." *Egypt v. United States*, No. 23 Civ. 2930, 2024 WL 3236803, at *12 (S.D.N.Y. May 30, 2024), *report and recommendation adopted*, No. 23 Civ 2930, 2024 WL 3236910 (S.D.N.Y. June 28, 2024). "The New York Court of Appeals has noted that the distinction between medical malpractice and negligence is a subtle one, for medical malpractice is but a species of negligence and no rigid analytical line separates the two." *Ivison v. Extended Fertility, LLC*, No. 23 Civ. 4503, 2024 WL 263461, at *6 (S.D.N.Y. Jan. 24, 2024). Both types of "claim[s] rests on the principle that healthcare providers have a duty to exercise reasonable care and diligence in safeguarding a patient . . . ." *Currie v. Oneida Health Sys., Inc.*, 202 N.Y.S.3d 789, 793 (App. Div. 2023). "When that duty arises from medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician to a particular patient, the breach of such duty sounds in medical malpractice and not ordinary negligence." *Id.* Put differently, in a medical malpractice claim, "the acts or omissions complained of involve a matter of medical science or art requiring special skills not ordinarily possessed by lay persons." *Id*.

Not all negligence claims arising out of an alleged breach of duty committed during a medical procedure are medical malpractice claims. "Where the challenged conduct was not linked to the medical *treatment* of a particular patient[,] . . . the claim sounds in negligence and not medical malpractice." *Ivison*, 2024 WL 263461, at *6 (emphasis added). In other words, in an ordinary negligence claim arising from a medical procedure, a plaintiff must allege a "failure to fulfill a different duty"—that is, one that does not "bear[] a substantial relationship to the rendition

of medical treatment by a licensed physician to a particular patient." *Rabinovich v. Maimonides Med. Ctr.*, 113 N.Y.S.3d 198, 202-03 (App. Div. 2019).

### B. Statutes of Limitations

"Where jurisdiction is predicated on diversity of citizenship, a federal court must apply the choice-of-law rules of the forum state." *Thea v. Kleinhandler*, 807 F.3d 492, 497 (2d Cir. 2015). "Under New York law, [federal courts] apply the rules of decision that are considered 'substantive,' including statutes of limitation." *Id.* (quoting *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Therefore, in adjudicating Defendants' Motions, this Court applies New York's statute of limitations for Ms. Lev-Ary's negligence claims.

As foreshadowed above, whether Ms. Lev-Ary's negligence claims sound in ordinary negligence or medical malpractice matters for statute of limitations purposes. Medical malpractice claims have a shorter statute of limitations than ordinary negligence claims. A plaintiff must bring her medical malpractice claim within two-and-a-half years of the negligent act—that is, the date of the "act, omission or failure complained of." N.Y. C.P.L.R. § 214-a (McKinney 2018) ("An action for medical, dental or podiatric malpractice must be commenced within two years and six months of the act, omission or failure complained of . . . ."); *see, e.g.*, *Lohnas v. Luzi*, 94 N.E.3d 892, 894 (N.Y. 2018) ("CPLR 214–a provides that a medical malpractice action must be commenced within 2½ years of the relevant act . . . ."); *Goldsmith v. Howmedica, Inc.*, 491 N.E.2d 1097, 1098 (N.Y. 1986). The statute of limitations in a medical malpractice action is tolled in certain circumstances, such as when the claim is based on the discovery of a foreign object in the patient's body or on the negligent failure to diagnose a patient with cancer. *See* N.Y. C.P.L.R. § 214-a(a)-(b) (McKinney 2018). But there is no statutory provision regarding the tolling of medical malpractice claims relating to in vitro fertilization specifically.

8

The statute of limitations in an ordinary negligence claim is longer than that of a medical malpractice claim. "[T]here is a three-year limitations period for claims sounding in [ordinary] negligence," *Levin v. Sarah Lawrence Coll.*, 747 F. Supp. 3d 645, 659 (S.D.N.Y. 2024) (citing N.Y. C.P.L.R. § 214 (McKinney 2018)), which "generally begins to run when a cause of action accrues," *B.F. v. Reprod. Med. Assocs. of N.Y., LLP*, 92 N.E.3d 766, 769 (N.Y. 2017). "[A]ccrual [in an ordinary negligence claim] occurs when the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint." *Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 292 (N.Y. 1993). In other words, "[t]he Statute of Limitations does not run until there is a legal right to relief." *Id.*; *see also Reprod. Med. Assocs. of N.Y., LLP*, 92 N.E.3d at 770 ("A claim accrues when all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief.").

### C. Application

In this case, Ms. Lev-Ary argues that her claims sound in ordinary negligence and are timely because those claims "accrued when [her oocytes'] destruction was discovered, on July 26, 2021." Pl.'s Opp'n at 22. AFS, on the other hand, asserts that Ms. Lev-Ary's claim against it is one of medical malpractice and needed to have "been brought by April 7, 2017,"[5] two years and six months after "AFS retrieved [her] oocytes on November 7, 2014." Mem. L. Supp. Mot. Summ. J. ("AFS's Mem.") at 8, ECF No. 83. MFS fails to clearly elucidate its stance on whether Ms. Lev-Ary's negligence claim against it is properly categorized as an ordinary negligence or a medical malpractice claim, arguing instead that irrespective of the type of negligence claim, the statute of limitations has run. *See* Br. Supp. Mot. Summ. J. ("MFS's Mem.") at 3-8, ECF No. 88. For

---

[5] The Court notes that two years and six months after November 7, 2014, is actually May 17, 2017, and not April 17, 2017, as Defendants assert.

reasons explained below, the Court holds that Ms. Lev-Ary's negligence claims sounds in ordinary negligence and are timely.

    1.   Ms. Lev-Ary's Claims Sounds in Ordinary Negligence.

Ms. Lev-Ary asserts "that AFS embryologist negligently destroyed her oocytes when freezing them," and "that MFS's embryologist negligently left the oocytes out of the freezer tank too long." Pl.'s Opp'n at 11. As explained below, these alleged breaches give rise to ordinary negligence, not medical malpractice, claims.

    *a.   Ms. Lev-Ary's Claim against MFS Regarding Storage of Her Oocytes*

Starting with the easier claim—Ms. Lev-Ary's claim against MFS—there is no question that a claim related to the negligent removal of a vessel containing oocytes from a freezer tank sounds in ordinary negligence. Under New York law, "claims stem[ming] from the alleged mishandling and/or loss of [a plaintiff's] successfully retrieved eggs," sound in ordinary negligence, while claims arising "from the [egg] retrieval process itself" sound in medical malpractice. *Ivison,* 2024 WL 263461, at *6; *see also Bledsoe v. Ctr. for Hum. Reprod.*, 207 N.Y.S.3d 519, 521 (App. Div. 2024) (explaining that claims arising from "the mere maintenance of [an egg] storage tank[]" would fall within the universe of ordinary negligence, while claims arising from the act of "[r]etrieving the eggs from the ovaries" would fall within the realm of medical malpractice). This conclusion follows from the general rule, as articulated by the New York Court of Appeals, that where "the challenged conduct was not linked to the medical treatment of a particular patient," the claim sounds in negligence and not in medical malpractice. *Weiner v. Lenox Hill Hosp.*, 673 N.E.2d 914, 915 (N.Y. 1996). Thus, for example, while the process of drawing blood or extracting organs for donation both involve "medical treatment," the subsequent testing of the extracted blood or handling of the removed organs does not—and claims arising from these acts sound in ordinary negligence. *See, e.g.*, *id.* at 916 (holding that a hospital's "failure

to adopt and prescribe proper procedures and regulations" for the collection of blood, including testing and screening blood for HIV, sounded in negligence not malpractice); *Rodriguez v. Saal*, 841 N.Y.S.2d 232, 235-36 (App. Div. 2007) (characterizing case "turn[ing] on [defendant's] duties as a collection and distribution center of donated organs" as sounding in negligence, not medical malpractice, because there was "no claim of a physician-patient relationship between plaintiff and [defendant]"). In the same way, retrieving oocytes from a patient constitutes medical treatment of that particular patient; storing her oocytes does not. *See Ivison,* 2024 WL 263461, at *6; *Bledsoe*, 207 N.Y.S.3d at 521.

As noted *supra*, MFS does not present a cogent argument as to why Ms. Lev-Ary's negligence claim against it should not be considered as sounding in ordinary negligence. Instead, MFS's argument is, *inter alia*, that Ms. Lev-Ary's negligence claim against it is time barred. The Court considers that argument below. But at the preliminary step of considering the type, not timeliness, of Ms. Lev-Ary's negligence claim against MFS, the Court holds that this claim sounds in ordinary negligence.

### b. Ms. Lev-Ary's Claim against AFS Regarding Freezing of Her Oocytes

Determining the proper cause of action for Ms. Lev-Ary's claim against AFS is somewhat more difficult. As noted *supra*, she has abandoned her medical malpractice claim against AFS. Instead, "[h]er negligence claim is grounded in the ordinary acts of negligence by AFS," and she alleges "that AFS's embryologist negligently destroyed her oocytes when freezing them." Pl.'s Opp'n at 11-12. But AFS argues that because "[P]laintiff's expert suggests there was negligence in the retrieval and preparation of the oocytes for cryopreservation," her claims against it are not for ordinary negligence but instead sound in medical malpractice. AFS's Mem. at 8; *see id.* at 7-9. Having carefully reviewed the parties' papers submitted in connection with the pending

11

Motions, the Court agrees with Ms. Lev-Ary that her claim sounds in ordinary negligence, not medical malpractice.

At the outset, it is important to note that, as the Court understands it, Ms. Lev-Ary's claim against AFS does not allege negligence in the process of "preparing" her oocytes for cryopreservation. Instead, her allegation pertains to the actual act of freezing the oocytes—the vitrification process. *See, e.g.*, Pl.'s Opp'n at 14 (describing claim against AFS as arising "[w]hen the AFS embryologist negligently failed to properly freeze Ms. Lev-Ary's eggs . . . ."); *id.* at 15 (describing "the negligence here" as including, *inter alia*, the embryologist's "negligent failure to freeze [Ms. Lev-Ary's oocytes] properly"); Report of Dr. Douglas Raburn at 17-18, ECF No. 93-32 (describing, in expert report, that Ms. Lev-Ary's oocytes were "most likely still viable" "[f]rom the time the oocytes were retrieved to the time cryopreservation was initiated," meaning that the first point in which the oocytes could have been destroyed was during or after "the time of oocyte cryopreservation"); *id.* at 17 ("I conclude to a reasonable degree of scientific certainty that the oocytes were rendered nonviable . . . at the point in time they were vitrified . . . .").

The Court has been unable to identify any cases that directly address the precise question presented here—i.e., whether claims arising from the act of freezing oocytes sound in medical malpractice or in ordinary negligence. But the principle articulated by the New York Court of Appeals in *Weiner*—that claims arising from acts that are "not linked to the medical treatment of a particular patient" sound in ordinary negligence—compels the conclusion that Ms. Levy-Ary's claim against AFS arising from the freezing of her oocytes do not sound in medical malpractice. True, freezing oocytes is certainly related to medical treatments, as it follows one medical treatment (the retrieval of the oocytes) and may precede another one (e.g., implantation of an embryo). But that is also true of the testing of donated blood for infectious diseases, which similarly follows one medical treatment (the drawing of blood), and may precede another one (e.g.,

transfusion)—and the Court of Appeals nevertheless concluded that blood testing is not an act "linked" to such treatment for purposes of determining whether a claim falls within the realm of medical malpractice. *See Weiner*, 673 N.E.2d at 915. Similarly, here, the act of freezing oocytes itself is not "linked to the medical treatment of a particular patient," and therefore claims arising from that act do not sound in medical malpractice.

The First Department's decision in *Bledsoe*, referenced *supra*, does not directly hold to the contrary. *Bledsoe* stated that claims arising from the act of "*preparing* [eggs] for cryopreservation" would fall within the realm of medical malpractice, while subsequent acts performed "once cryopreservation has *commenced*," such as "the mere maintenance of the [eggs'] storage tanks," would fall within the universe of ordinary negligence. 207 N.Y.S.3d at 521. But *Bledsoe* did not say into which category the act of vitrification *itself* falls. It is true, however, that *Bledsoe*'s reasoning could be interpreted as suggesting that claims stemming from the freezing of oocytes sound in medical malpractice. That is because *Bledsoe*'s holding was based in part on its articulation of the distinction between ordinary negligence and medical malpractice claims as resting on whether the claim arises from a "clear act[] of medical science or art requiring a specialized skillset appropriately characterized as medical in nature," or "requiring special skills not ordinarily possessed by lay persons," in which case it would sound in malpractice. *Id.* That arguably supports the notion that Ms. Lev-Ary's claim against AFS is one for medical practice— assuming (which the Court does not) that the freezing of oocytes in fact requires more of a specialized skillset than does the testing of donated blood for infectious diseases (a point that Ms. Lev-Ary disputes, *see* Pl.'s Opp'n. at 18 (noting that, unlike egg retrieval, the freezing of eggs is "performed not by physicians, but by laboratory scientists who often have only bachelor's degrees," and who "act without physician involvement or supervision")).

Ultimately, however, the Court declines to follow that reasoning here.  In absence of controlling authority from the New York Court of Appeals, "the decisions of New York State's Appellate Division are helpful indicators," but it ultimately remains the task of "a federal court sitting in diversity . . . to predict how" the Court of Appeals would rule on the question at hand. *Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116 (2d Cir. 2000).  Here, the clearest relevant guidance from the New York Court of Appeals is its statement in *Weiner* that claims arising from conduct "not linked to the medical treatment of a particular patient" sound in ordinary negligence and not in medical malpractice.  673 N.E.2d at 915.  And because this Court concludes that the freezing of oocytes—like the testing of donated blood—is "not linked to the medical treatment of a particular patient," it holds that Ms. Lev-Ary's claim against AFS is one for ordinary negligence. *Id.*

### 2.  Ms. Lev-Ary's Claims are Timely.

Ms. Lev-Ary argues that her claims against AFS and MFS accrued when she discovered that her oocytes were nonviable—that is, on June 26, 2021, when they were thawed.  *See* Pl.'s Opp'n at 22.  AFS disagrees.  It states that Ms. Lev-Ary should have filed her lawsuit within three years of her alleged injury, which occurred either when her oocytes were negligently improperly frozen by an AFS embryologist in 2014 or when they were negligently left out of the cryogenic tank by an MFS embryologist in 2016.  *See* Mem. L. in Reply ("AFS's Reply") at 9, ECF No. 96. MFS's argument is substantially similar.  *See, e.g.*, MFS's Mem. at 4-5 ("[A]ny injury to Plaintiff's eggs that were caused by [MFS] occurred at the time that [its embryologist] took them out of the tank and showed them to Plaintiff.  This occurred on November 29, 2016 . . . . As such, Plaintiff's cause of action against [MFS] accrued at this time . . . .").  Though this is a close case, the Court concludes that Ms. Lev-Ary has the winning argument.

As explained *supra*, the statute of limitations for an ordinary negligence claim begins to accrue "when the claim becomes enforceable, i.e., when *all elements of the tort* can be truthfully alleged in a complaint." *Kronos*, 612 N.E.2d. at 292 (emphasis added). Here, it was not until Ms. Lev-Ary's oocytes were thawed in 2021 that it became possible to truthfully allege all of the elements of her negligence claims, because it was only then that she could verify that her oocytes were, in fact, destroyed. While it may be true that "[Ms. Lev-Ary] was well aware of the potential non-viability of her eggs many years before" (i.e., in 2016 when they were negligently left out of a cryogenic tank), MFS's Mem. at 5, her awareness of such *potential* non-viability would not have been enough to render the negligence claim enforceable at that point. "Under New York law, in order to recover in . . . negligence . . . , claimants must prove, *inter alia*, that their persons or property *have been* injured"—not that they were potentially injured. *Benoit v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 491, 498 (2d Cir. 2020); *cf. Caronia v. Philip Morris USA, Inc.*, 5 N.E.3d 11, 14 (N.Y. 2013) ("The requirement that a plaintiff sustain physical harm before being able to recover in tort is a fundamental principle of our state's tort system. The physical harm requirement . . . provides a basis for the factfinder to determine whether a litigant actually possesses a claim . . . ."); *id.* ("A threat of future harm is insufficient to impose liability against a defendant in a tort context."). Because Ms. Lev-Ary could not prove her injury until her oocytes were thawed, her claim was not enforceable until July 2021, at which point she could truthfully allege all of the requisite elements of her negligence claim. Thus, the three-year statute of limitations began to run then, and her negligence claims are timely.

The Court's holding that Ms. Lev-Ary's claims are timely should not be understood as premised on the notion that there is a knowledge requirement for negligence claims brought under New York law. Contra Ms. Lev-Ary's assertion that "[i]n a case of ordinary negligence, . . . the claim does not accrue until the time a plaintiff knows or should have known that she had been

injured," Pl.'s Opp'n at 12, and AFS's assertion that "[c]aselaw is clear that the statute of limitations begins to run when plaintiff knows the facts underlying the claim," AFS's Mem. at 10, New York courts and federal courts applying New York law have explicitly held that an injury can accrue even if a plaintiff does not know that she has been injured. *See, e.g.*, *Kronos*, 612 N.E.2 at 292 ("[A]s a general proposition, a tort cause of action cannot accrue until an injury is sustained. That, rather than the wrongful act of defendant or discovery of the injury by plaintiff, is the relevant date for marking accrual."); *Levin v. Sarah Lawrence Coll.*, 747 F. Supp. 3d 645, 659 (S.D.N.Y. 2024) ("Generally, the limitations period [in a negligence action] begins to run at the time and place of injury, even though the injured party may be ignorant of the existence of the wrong or injury."). To the extent Ms. Lev-Ary argues her negligence claims are timely because they were brought within three years of when she learned her oocytes were destroyed, that argument is legally unsound.

To be clear: New York law explicitly states that the accrual period for an ordinary negligence claim begins at the time the claim becomes "enforceable," not when the plaintiff becomes aware of her injury. Here, Ms. Lev-Ary's claim became enforceable when her oocytes were thawed in 2021 because it was only then that it became apparent that they had been rendered nonviable. It just so happens that this was also the point at which Ms. Lev-Ary herself learned of her injury. But in other cases it could be possible for a negligence claim to become enforceable before a plaintiff becomes aware of her injuries, even if this means that that the plaintiff is ultimately foreclosed from bringing such a claim because she only learns about the injury (and thus seeks to recover) after the three-year statute of limitations has run. *See, e.g.*, *Playford v. Phelps Mem'l Hosp. Ctr.*, 680 N.Y.S. 2d 267, 268 (App. Div. 1998), *leave to appeal denied* 711 N.E.2d 983 (N.Y. 1999) (holding that negligence complaint filed by HIV positive plaintiff, who was told in error that she was HIV negative and did not discover that she had been misdiagnosed

until three years later (after two of her children were born HIV positive), was time barred from bringing complaint). Here however, Ms. Lev-Ary's claims are timely because it was impossible to "truthfully allege[] in a complaint" that Defendants' negligence resulted in the destruction of her oocytes until they were thawed in 2021. *Kronos*, 612 N.E.2d. at 292.

A contrary holding in Defendants' favor on this point—that is, holding that Ms. Lev-Ary's negligence claims began to accrue either at vitrification or when her oocytes were left outside of the storage tank—would make little sense. Were Ms. Lev-Ary's claim against AFS to have accrued at vitrification, on November 7, 2014, the statute of limitations to bring this claim would have run around November 7, 2017—more than three years before it became possible to prove that her oocytes had been destroyed (which did not occur until they were thawed in 2021). Similarly, were Ms. Lev-Ary's claims against MFS to have accrued when she saw her oocytes outside of the cryogenic tank in fall 2016, she would have been obliged to file a complaint sometime within the next three years. But as noted, any complaint she filed during that period could only speculate about the viability of her oocytes, which would be insufficient to state a claim for negligence. Essentially, Defendants' reasoning would require Ms. Lev-Ary to, as a condition of filing a timely, legally enforceable claim, thaw her oocytes before she was ready to use them—which, if they had not already been destroyed, would cause them to go to waste. It cannot be that a plaintiff must risk incurring the very injury of which she complains in order to bring a claim for that injury. *Cf. St. Anne-Nackawic Pulp Co. v. Research-Cottrell, Inc.*, 788 F. Supp. 729, 738 (S.D.N.Y. 1992) (describing situation where "the statute of limitations would start to run before," *inter alia*, "plaintiff could sue" as "an absurd result"); *Evans v. Visual Technology Inc.*, 953 F.Supp. 453, 457 (N.D.N.Y. 1997) ("In determining the accrual date of a cause of action, New York courts attempt to strike a balance between fairness to a plaintiff to allow her reasonable time to pursue her claim with the fairness to defendants to respond to claims without inappropriate or prejudicial delays.").

### 3.  Ms. Lev-Ary Can Make a Prima Facie Negligence Claim

Defendants advance an additional argument as to why Ms. Lev-Ary's negligence claims against them must fail: that, by virtue of presenting two "mutually exclusive" theories as to how each Defendant destroyed her oocytes, Ms. Lev-Ary cannot prove the requisite causation element of a prima facie negligence claim. AFS's Reply at 10; Mem. L. Reply. Pl.'s Opp'n ("MFS's Reply") at 4, ECF No. 97.  That is, the theory of her claims is that her oocytes were destroyed either at the time that they were frozen by AFS, or when they were removed from storage by MFS—but Defendants argue that, because she cannot say for certain which of those acts led to her oocytes' destruction, she cannot establish the requisite causation element with respect to either. This argument is unavailing.

"In order to prevail on a negligence claim, a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Pasternack v. Lab'y Corp. of Am. Holdings*, 59 N.E.3d 485, 490 (N.Y. 2016).  Specifically with respect to the third element, the only one at issue in this case, courts applying New York law have explained that "for there to be a recovery for an injury, it must be established that defendant's act was a cause-in-fact of an injury."  *Wimbledon Fin. Master Fund Ltd. v. Bienert Miller & Katzman, PLC*, 678 F. Supp. 3d 417, 427 (S.D.N.Y. 2023).  "This principle requires a plaintiff to establish, beyond the point of speculation and conjecture, a factual, causal connection between its losses and a defendant's actions."  *Aegis Inc. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 179 (2d Cir. 2013).  Thus, "[i]f there are several possible causes of injury, for one or more of which defendant is not responsible, plaintiff cannot recover without proving the injury was sustained wholly or in part by a cause for which the defendant was responsible."  *Bernstein v. City of New York*, 511 N.E.2d 52, 53 (N.Y. 1987); *cf. Wimbledon*, 678 F. Supp. 3d at 427 ("A defendant's

conduct is not a cause-in-fact of an injury or loss if the injury or loss would have occurred regardless of the conduct.").

Though a plaintiff generally must establish "a factual, causal connection between its losses and a defendant's actions," *Aegis*, 737 F.3d at 179, in certain circumstances, "a group of defendants, rather than a single causative defendant, shoulders the liability for plaintiff's injuries." *Hamilton v. Beretta U.S.A. Corp.*, 222 F.3d 36, 45 (2d Cir. 2000). "The accepted tort doctrine[] of alternative liability . . . [is] available in some personal injury cases to permit recovery where the precise identification of a wrongdoer is impossible." *Hymowitz v. Eli Lilly and Co.*, 539 N.E.2d 1069, 1073 (N.Y. 1989). "[W]here the conduct of two or more defendants is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one, the burden is placed on those defendants to prove that they did not cause the harm." *Silver v. Sportsstuff, Inc.*, 14 N.Y.S. 3d 421, 423 (App. Div. 2015). "If the defendants cannot meet that burden, they are jointly and severally liable." *Id.*; *see also Zulauf v. State*, 462 N.Y.S. 2d 560, 563 (Ct. Cl. 1983) ("[W]here it can be found that the injury was caused by the acts of only one tortfeasor, but it is not known which one caused the injury, all are liable absent a showing as to whose act was the cause."). A plaintiff seeking to utilize the alternative liability doctrine typically must bring claims against all possible tortfeasors, who usually need to have better access to information than the plaintiff with respect to which caused plaintiff's injury. *See Hymowitz*, 539 N.E.2d at 1074. *But see Silver*, 14 N.Y.S. 3d at 424 (stating defendants lack of better access than plaintiff to information regarding who caused the injury "d[id] not bar application of the [alternative liability] doctrine in th[at] case").

Here, Defendants assert that Ms. Lev-Ary's negligence claim fails because her expert could not state with certainty which act of negligence—an error in the freezing of the oocytes by AFS or the removal of the oocytes from the cryopreservation tank for too long by MFS—destroyed them.

Defendants argue that, because either event was sufficient to render the oocytes non-viable, the events are mutually exclusive, and Ms. Lev-Ary cannot say with requisite certainty that either caused her oocytes to be destroyed. *See* AFS's Reply at 10; MFS's Reply at 4. But under the alternative liability doctrine, both Defendants may be held liable here. Ms. Lev-Ary has put forth evidence that her oocytes were most likely destroyed either by AFS's or MFS's negligence, and Defendants do not argue that there is a different tortfeasor against whom she should have levied charges. And while it is not apparent that Defendants are better suited than Ms. Lev-Ary to determine which of their negligence caused her oocytes to become non-viable, this does not render the alternative liability doctrine inapposite. *See Silver*, 14. N.Y.S. at 424-25 ("reject[ing] the contentions of [the defendants] that the doctrine of alternative liability should not apply . . . because they d[id] not have better access than the plaintiff[] to information which might resolve the uncertainty as to which one of them" caused plaintiffs injury "[e]ven assuming that contention were true as a factual matter"). "[G]iven the small number of possible wrongdoers and concomitantly high probability . . . that they injured the plaintiff, it is not unfair to require [the Defendants] to prove that they did not cause the harm." *Id.* at 424 (citing *Hymowitz*, 539 N.E.2d at 1074). In sum, Ms. Lev-Ary may proceed with her negligence claims under an alternative liability theory, in which case each Defendant shall have the opportunity to prove at trial that it did not cause Ms. Lev-Ary's oocytes to be destroyed.[6]

---

[6] Defendants also argue that Plaintiff's expert's testimony is "unreliable and inadmissible" because the expert was not able to state, with certainty, what caused Plaintiff's oocytes to be destroyed. *See* AFS's Reply at 9-10; MFS's Reply at 2-3. Having closely reviewed Dr. Raburn's report, the Court concludes that it is both admissible and reliable. There is no dispute over the factual basis of Dr. Raburn's report, nor over Dr. Raburn's qualifications, nor over the methodologies he used in his report. That Dr. Raburn could not say with certainty what caused Plaintiff's oocytes to be destroyed does not render his report unreliable and inadmissible because "it would be unreasonable to conclude that the subject of scientific testimony must be known to a certainty." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993). To the extent Defendants may take other issues with Dr. Raburn's testimony, they may make those arguments in pre-trial motions.

          4.  Ms. Lev-Ary Has Not Made a Prima Facie Showing of Entitlement to Present a *Res Ipsa* Theory

Ms. Lev-Ary argues that she "is entitled to present her case to a jury under the theory of *res ipsa loquitor* [sic], because the loss of all 16 of her oocytes is an injury 'which does not ordinarily occur in the absence of negligence, other reasonable causes . . . are sufficiently eliminated by the evidence, and the indicated negligence is within the scope of the defendant[s'] duty' to" her.  Pl.'s Opp'n. at 24 (alteration in original) (quoting Restatement (Second) of Torts, § 328D).  MFS and AFS oppose on the grounds that there were too many moments where Ms. Lev-Ary's oocytes could have been rendered nonviable to impute any responsibility onto either of them specifically.  *See* AFS's Reply at 8-9; MFS's Reply at 5-6.  Defendants are correct.

"*Res ipsa loquitur* is an often confused and often misused doctrine that enables a jury presented only with circumstantial evidence to infer negligence simply from the fact that an event happened."  *St. Paul Fire & Marine Ins. Co. v. City of New York*, 907 F.2d 299, 302 (2d Cir. 1990).  "Where the actual or specific cause of an accident is unknown, under the doctrine of res ipsa loquitur a jury may in certain circumstances infer negligence merely from the happening of an event and the defendant's relation to it."  *Kambat v. St. Francis Hosp.*, 678 N.E.2d 456, 458 (N.Y. 1997).  Put differently, in deciding a negligence claim presented under a *res ipsa loquitur* theory, "the circumstantial evidence allows but does not require the jury to infer that the defendant was negligent."  *Morejon v. Rais Constr. Co.*, 851 N.E.2d 1143, 1146 (N.Y. 2006).  "Once a plaintiff's proof establishes the following three conditions, a prima facie case of negligence exists and plaintiff is entitled to have res ipsa loquitur charged to the jury.  First, the event must be of a kind that ordinarily does not occur in the absence of someone's negligence; second, it must be caused by an agency or instrumentality within the exclusive control of the defendant; and third, it

must not have been due to any voluntary action or contribution on the part of the plaintiff." *Kambat*, 678 N.E.2d at 458.

Ms. Lev-Ary is not entitled to proceed against Defendants on a *res ipsa loquitur* theory of negligence because she cannot show that her oocytes were "within the exclusive control of the [D]efendant[s]." *Id.* As Defendants note, her expert "lists several opportunities for the destruction of the oocytes," AFS's Reply at 8, during which time the oocytes were in AFS's possession, MFS's possession, Ms. Lev-Ary's possession, as well as in the possession of other third-parties, *see* MFS's Reply at 6. Even narrowing down the moments Ms. Lev-Ary's oocytes could have been destroyed from "several" to "two"—when AFS vitrified them and when MFS took them out of the cryopreservation solution to show them to Ms. Lev-Ary— she still could not proceed on a *res ipsa loquitur* theory because inherent in her theory of Defendants' negligence is her oocytes' being in both AFS's and MFS's possession. AFS's Reply at 5, 8. Accordingly, AFS and MFS's Motions for Summary Judgment are GRANTED insofar as to prevent Ms. Lev-Ary from advancing a *res ipsa loquitur* negligence claim.

\* \* \*

For the reasons explained above, Defendants' Motions for Summary Judgment are **GRANTED IN PART and DENIED IN PART** as to Ms. Lev-Ary's negligence claims. The Motions are GRANTED insofar as Ms. Lev-Ary may not advance a *res ipsa loquitur* theory of negligence at trial. The Motions are DENIED in all other respects on her negligence claims.

## II.    Breach of Bailment

Ms. Lev-Ary brings her breach of bailment claim against MFS specifically, claiming that "[Ms. Lev-Ary] gave and [MFS] accepted her frozen oocytes to [MFS] to store and keep safe, creating a bailment. . . . While the oocytes were in [its] possession, [MFS] had a duty to keep the oocytes safe and protect them from damage or loss. [MFS] breached this duty [because it] returned

the oocytes to [Ms. Lev-Ary] irrevocably damaged, destroyed, and unusable." Am. Compl. ¶¶ 94-97.  MFS seeks summary judgment on Ms. Lev-Ary's bailment claim because "she cannot show that her eggs were delivered to [it] in good condition."  MFS's Reply at 5.  MFS is correct.

"A Bailment is the delivery of personal property by a bailor to a bailee who holds the property for a certain purpose." *Wallace v. Health Quest Sys., Inc.*, No. 20 Civ. 545, 2021 WL 1109727, at *13 (S.D.N.Y. March 23, 2021).  "To establish a bailment under New York law, [p]laintiff must show the intent to create a bailment, delivery of possession of the bailed items, and acceptance of the items by the bailee." *Allianz Glob. Corp. & Specialty v. MSC "Monterey"*, No. 13 Civ. 7563, 2014 WL 4631891, at *3 (S.D.N.Y. Sept. 16, 2014).  "Once a bailment has been established, to state a claim for breach of a bailment, the bailor must plead the bailee failed to exercise care and diligence in protecting and keeping safe the bailee's property." *Wallace*, 2021 WL 1109727, at *13.  "[A] bailor makes out a prima facie case of negligence for breach of bailment by establishing that the goods were delivered to the bailee in good condition and returned in damaged condition." *Zurich Ins. Grp. v. Grandurismo, Inc.*, No. 00 Civ. 980, 2000 WL 1677941, at *3 (S.D.N.Y. Nov. 8, 2000); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Garpo Marine Servs., Inc.*, 773 F. App'x 22, 25 (2d Cir. 2019) (summary order) (same).

Ms. Lev-Ary's breach of bailment claim fails because she cannot establish that "the goods"—her oocytes—were delivered to MFS "in good condition."  In allowing Ms. Lev-Ary to advance two mutually exclusive ordinary negligence causes of action, the Court accepts as true that Ms. Lev-Ary's oocytes were rendered nonviable either when they were improperly frozen or when they were improperly left out of their preserving solution for too long.  But if Ms. Lev-Ary's oocytes were destroyed at vitrification, as she alleges, it is impossible for her to establish that her oocytes were delivered in good condition and returned damaged.  Given that one of Ms. Lev-Ary's causes of action—her negligence claim against AFS—prevents her from making a prima facie case

for breach of bailment, MFS's Motion for Summary Judgment is GRANTED as to Ms. Lev-Ary's bailment claim.

## CONCLUSION

For the reasons explained above, Defendants' Motions for Summary Judgment are GRANTED IN PART and DENIED IN PART.  Summary judgment is granted in Defendants' favor as to Ms. Lev-Ary's medical malpractice, deceptive business practices, and bailment claims. Summary judgment is also granted in part as to Ms. Lev-Ary's negligence claim specifically as brought under a *res ipsa loquitur* theory.  Defendant's Motions for Summary Judgment are denied as to Ms. Lev-Ary's ordinary negligence claims.

Within one week of the date of this Opinion and Order, the parties shall file a joint letter indicating their availability for a trial to commence in February, March, or April 2026.

The Clerk of Court is respectfully requested to terminate ECF Nos. 80 and 85.

SO ORDERED.

Dated: September 10, 2025

New York, New York

DALE E. HO
United States District Judge